UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X
                                                         :

THE BRONX FREEDOM FUND, *individually and on* :
*behalf of all others similarly situated,*               :

                                          :

                       Plaintiff,      :         21 Civ. 10614 (JPC)

                                           :

        -v-                        :       <u>OPINION AND ORDER</u>

                                         :

                                         :

THE CITY OF NEW YORK, *et al.,*             :

                                         :

                     Defendants.     :

                                         :

----------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      The Bronx Freedom Fund (the "Fund") alleges that the Bronx County Criminal Court Clerk's Office (the "Clerk's Office"), together with the New York City Department of Finance (the "DOF"), regularly forfeits cash bails without following the proper procedures.  In its three-Count, twice-amended Complaint, the Fund asserts claims under 42 U.S.C. § 1983, the New York State Constitution, and 28 U.S.C. §§ 2201 and 2202 against the City of New York (the "City"); the former New York City Criminal Court Chief Clerk, Justin Barry; the Bronx County Borough Chief Clerk, William Kalish; and various John and Jane Doe Defendants, seeking injunctive and declaratory relief, compensatory damages, and attorneys' fees.

      Before the Court are motions to dismiss brought by the City, Barry, and Kalish.  The Fund's requests for prospective relief in the form of an injunction and a declaratory judgment are dismissed without prejudice for want of jurisdiction, and the Fund's Section 1983 claim against the City is dismissed with prejudice.  Having dismissed the Fund's federal claims, the Court declines to exercise supplemental jurisdiction over its state law claims, and so dismisses them

without prejudice to the Fund's refiling them in state court.  Accordingly, Defendants' motions are granted, and the Second Amended Complaint is dismissed in its entirety.

## I.  Background

### A.    Facts[1]

The Fund is a non-profit bail fund in the Bronx.  SAC ¶ 1 at 3.[2]  It has provided "bail assistance to indigent criminal defendants facing pretrial detention for misdemeanor charges for nearly a decade," *id.*, including by "post[ing] cash bail to help secure the freedom of indigent New Yorkers," *id.* ¶ 12.  According to the Fund, "the large majority of those released on bail or bond appear for their court appearances."  *Id.* ¶ 77.  Indeed, as alleged, approximately 92% of the Fund's clients make their court appearances, and the bail money is then returned to the Fund.  *Id.* ¶ 15.  But in certain instances, the Fund has been "subject to improper forfeiture [procedures]," *id.* ¶ 1 at 3, carried out (1) by the Clerk's Office and (2) by the DOF—each in contravention of its respective stated policy.  *See id.* ¶¶ 17, 47.

---

[1] The following facts, which are assumed true on a motion to dismiss, are taken from the Second Amended Complaint, Dkt. 77 ("SAC").  *See Interpharm, Inc. v. Wells  Fargo Bank, Nat'l Ass'n,* 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss  pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiffs' favor").  The Court has previously discussed the facts of this case, as then alleged by the Fund in the first Amended Complaint, Dkt. 51, in its March 31, 2023 Opinion and Order dismissing that Amended Complaint.  *See Bronx Freedom Fund v. City of New York,* No. 21 Civ. 10614 (JPC), 2023 WL 2752098, at *1-4 (S.D.N.Y. Mar. 31, 2023).  The Court assumes the parties' familiarity with that Opinion and Order and the facts detailed therein, and so focuses here on any new facts alleged in the Second Amended Complaint, incorporating any repeated allegations only to the extent that they provide necessary or helpful context.

[2] The Second Amended Complaint begins with paragraphs numbered 1 through 8 on its first three pages, and then resumes paragraph numbering at 1.  Where two paragraphs share the same number, the Court clarifies by including the page number on which the cited paragraph appears.

The stated policy of the Clerk's Office is reflected in Operational Directive 2013-11, which was issued in 2013 by Barry in his capacity as the New York City Criminal Court Chief Clerk. *Id.* ¶ 3 at 4.[3]  The Directive "sets forth the specific practices and procedures to be followed by Clerks of the New York City court system when forfeiting cash bail," *id.*, and instructs in pertinent part: "Should the defendant fail to comply with his/her bail conditions *and the Court orders forfeiture*, the clerk will complete a CRC 131A-Forfeiture form.  The clerk will transmit [the] CRC 131A [form] to the NYC Department of Finance [i]n those cases in which the money was posted for cash bail or a partial security," *id.* ¶ 38 (emphasis in Second Amended Complaint), Exh. A (copy of Operational Directive 2013-11).  As described in the Second Amended Complaint, these procedures, when followed, comply with New York law requiring a court order before forfeiture is deemed to have occurred.  *See id.* ¶¶ 22-28 (asserting that, under New York jurisprudence, a court's order, not a defendant's failure to appear, makes forfeiture effective); *see also People v. Nicholas*, 760 N.E.2d 345, 348-39 (N.Y. 2001) (explaining that forfeiture does not occur "by operation of law, when a defendant first fails to appear at a scheduled court appearance," because "in some instances, it may be necessary [for the court] to conduct an inquiry to determine whether [the] defendant has proffered an excuse for the absence").

According to the Fund, the Clerk's Office violates this Directive by "engag[ing] in a practice of forfeiting cash bail upon the issuance of a bench warrant, despite the absence of a forfeiture order from the court." SAC ¶ 42.  On the Fund's telling, the Clerk's Office has "admitted in writing that it is standard practice for Clerks of the Court to forfeit bail with no written court order of forfeiture, no notation on the buck sheet (the official written record of each court

---

[3] The Fund alleges that Barry held this position until 2021, and that this position is currently held by Alia Razzaq.  SAC ¶ 3 at 4.

appearance in a New York City criminal case) and no mention of forfeiture in the court minutes." *Id.* ¶ 31.  For example, the Clerk's Office purportedly explained in a September 3, 2020 email to the Fund that "when a defendant warrants at any point between arraignment and sentencing, the bail is forfeited, regardless of when or how the case is disposed of."  *Id.* ¶ 44 (brackets omitted). And in an August 16, 2021 email, Kalish—who, as the Clerk of the Bronx Courthouse, is "responsible for implementing policies and practices concerning the forfeiture of bail in Bronx County," *id.* ¶ 4 at 4—purportedly "conflate[d] the issuance of a warrant and the forfeiture of bail" in describing the bail forfeiture procedures as follows:

> In those instances when cash bail or a bail bond is forfeited, a forfeiture form is completed, signed and submitted by the court clerk to the appropriate authority, i.e. cash bail forfeiture forms to the NYC Dept of Finance & bail bond forfeiture forms to the (Bronx) District attorney's Ofc– (Civil Collection unit) (form CRC 131A for cash bails forfeitures & CRC 131 for bail bond forfeitures.)

*Id.* ¶ 45.  These communications, asserts the Fund, reflect the view in the Clerk's Office "that the issuance of a bench warrant means that bail is forfeited."  *Id.* ¶ 46.  And once it has deemed a bail forfeited, the Clerk's Office sends the money to the DOF, along with the CRC 131A form.  *Id.* ¶ 48.

The Fund claims that, as with the Clerk's Office, the DOF's stated policy is to forfeit bail only upon receipt of a court-issued forfeiture order.  *Id.* ¶ 47.  The DOF explains on its website that "[the DOF] can receive a forfeit order from a court instructing [it] to keep bail" and that "[o]nly a judge can issue or reverse a forfeiture order."  *Id.*  But "[i]n communications between the Fund and the [DOF], the [DOF] has informed the Fund that it treats the CRC-131A forms as if they were forfeiture orders."  *Id.* ¶ 49.  The DOF then "issues a notice informing the suretor/depositor that the money is deemed forfeited," but fails to give any "indication that the court did not order forfeiture."  *Id.* ¶ 50.  It further "refuses to return the cash bail, and instead systematically remits

the bail to the Comptroller for the City of New York, who then invests the money on behalf of the City." *Id*. ¶ 51.  Moreover, as alleged, the DOF "continues to retain unlawfully forfeited bails more than a year after the commencement of" the instant action.  *Id.*  According to the Fund, this retention "indicates that the acceptance, retention, and refusal to return such bails is a policy of the [DOF]." *Id.*

The Fund provides four specific instances in which the bails it posted were deemed forfeited through these allegedly improper practices.  Between July 2018 and January 2020, the Bronx County Criminal Court Clerk's Office deemed bails posted by the Fund in the amounts of $750.00, $500.00, $2,000.00, and $1,000.00 to have been forfeited.  *See id.* ¶¶ 54-74, Exhs. B (documents related to the Fund's $750.00 bail deposit on May 20, 2018, deemed forfeited on July 17, 2018), C (documents related to the Fund's $500.00 bail deposit on December 24, 2019, deemed forfeited on January 14, 2020), D (documents related to the Fund's $2,000.00 bail deposit on January 8, 2019, deemed forfeited on February 19, 2019), E (documents related to the Fund's $1,000.00 bail deposit on November 21, 2019, deemed forfeited on December 3, 2019).  In each instance, the Clerk of Court made this determination without "evidence of a judicial order of forfeiture, either oral or written . . . in the court file or transcript," and then "sent a CRC-131A form" to the DOF.  *Id.* ¶¶ 55, 61, 66, 71.  And each time, the DOF—presented with only this information—then sent an official notice to the Fund (in response to the Fund's inquiry) that the bail had been deemed forfeited.  *Id.* ¶¶ 59 (describing the Fund's receipt of an official notice from the DOF on July 1, 2021 in connection with the $750.00 deposit), 64 (same, but in connection with the $500.00 deposit), 69 (same, but in connection with the $2,000.00 deposit), 74 (describing the Fund's receipt of an official notice from the DOF on August 26, 2020 in connection with the $1,000.00 deposit).

In 2019, the Fund "scal[ed] back its postings of bail," in light of bail reform measures in place at the time. *Id.* ¶ 76. As a result, the Fund's "current operations are primarily focused on [1] ensuring clients out on bail return to court and [2] collecting outstanding bails." *Id.* ¶ 1 at 3. Indeed, the Fund alleges that it currently has five outstanding bails in the Bronx specifically (and dozens across the New York City), *id.*, and further that it "currently has thousands of dollars at risk of illegal forfeiture in the Bronx," *id.* ¶ 76.

On April 7, 2023, however, in response to reports foreshadowing the rollback of bail reform measures, the Fund's board of directors voted to resume posting bails. *Id.* ¶ 1 at 3. In the Second Amended Complaint (filed on April 30, 2023), the Fund alleges that it "intends on posting bails in the Bronx within thirty days of [this] vote." *Id.*; *see also id.* ¶ 76 ("The Fund anticipates that it will post more bails in the near future, as Governor Hochul is expected to sign into law legislation that rolls back the 2019 bail reforms that resulted in the Fund scaling back its postings of bail in the first place."). As a result, the Fund expects that—once it resumes posting bails—it will be subject once again to purportedly unlawful forfeiture practices. *See id.* at 19 (section titled "the Bronx Freedom Fund's Exposure to Future Harm"). It explains that "[a]lthough the large majority of those released on bail or bond appear for their court appearances, at some point, someone released on bail will inevitably miss a court appearance." *Id.* ¶ 77; *see also id.* ¶ 15 ("In the vast majority of cases (approximately 92%), the clients for whom the Bronx Freedom Fund posts bail make their court appearances . . . ."). And it urges that "experience has shown that the [Bronx Criminal] Court will issue a bench warrant and the Clerk will . . . deem the bail forfeited without the Court issuing a forfeiture order and transmit the bail money to the [DOF]," which "will then receive a CRC-131A form and refuse to return the bail" to the Fund. *Id.* ¶¶ 77-78. Accordingly, among other relief, the Fund seeks not only compensatory damages from the City but also

prospective relief against Barry, Kalish, and the John and Jane Doe Defendants, in the form of a declaratory judgment and an injunction "against [these] Defendant[s'] policy of improperly forfeiting bail." *See id.* at 23-24.

**B.     Procedural History**

On December 10, 2021, the Fund initiated this putative class action against the City, the DOF, Barry, Kalish, and various John and Jane Doe Defendants, asserting claims under 42 U.S.C. § 1983, the New York State Constitution, and 28 U.S.C. §§ 2201 and 2202. Dkt. 1. The City and the DOF jointly moved to dismiss the Complaint on April 11, 2022, arguing, among other things, that the DOF was a non-suable entity and that the Fund had failed to state a *Monell* claim against the City. Dkt. 38. Kalish moved for dismissal on April 27, 2022, urging the availability of alternate state remedies, as well as his immunity from suit. Dkt. 43. That same day, Barry moved to dismiss the Complaint, raising similar arguments as the other Defendants and further contending that the Fund lacked standing for the prospective injunctive and declaratory relief sought against him. Dkt. 47. In response, on May 23, 2022, the Fund filed an Amended Complaint, Dkt. 51, thereby rendering the motions moot, Dkt. 55.

In June 2022, Kalish, Barry, the City, and the DOF moved to dismiss the Amended Complaint on similar grounds raised in their initial motions. Dkts. 57, 60, 63. The Fund opposed the motions, Dkts. 64, 65, and the Defendants replied, Dkts. 68-70. On March 31, 2023, this Court granted the motions, dismissed the Amended Complaint in its entirety, and terminated the DOF, a non-suable entity, as a party in the case. *See Bronx Freedom Fund*, 2023 WL 2752098, at *11. In that Opinion and Order, this Court dismissed the Fund's claims against Barry and Kalish, finding that the Fund had failed to allege the requisite likelihood of future injury to have standing to seek prospective relief, as well as the Fund's Section 1983 claim against the City, finding that the Fund

7

had failed to adequately allege a municipal policy. *Id.* at *5-10. The Court granted leave to amend *sua sponte*, but emphasized "that the Fund should amend only if it is able to resolve the pleading deficiencies outlined" in the Opinion and Order. *Id.* at *11.

On April 30, 2023, the Fund filed the Second Amended Complaint, bringing the same three claims as it did in its prior versions. SAC ¶¶ 86-95. In Count One, the Fund alleges that Defendants deprived the Fund "of [its] rights secured by the Fourth and Fourteenth Amendments" of the U.S. Constitution by conducting unreasonable seizures and unlawful taking of property and by depriving the Fund of its property "without due process of law and in violation of 42 U.S.C. § 1983." *Id.* ¶¶ 86-89. In Count Two, the Fund alleges the same conduct but under the New York State Constitution, Article 1, Sections 6 and 7. *Id.* ¶¶ 90-93. In Count Three, the Fund seeks declaratory relief related to these claims. *Id.* ¶¶ 94-95.

Kalish moved to dismiss the Second Amended Complaint on June 20, 2023, while Barry and the City moved to dismiss on June 23, 2023. *See* Dkts. 84 ("Kalish Motion"), 87 ("Barry Motion"), 90 ("City Motion"). On July 28, 2023, the Fund filed an omnibus opposition brief. Dkt. 95 ("Opposition"). Each Defendant replied. Dkts. 98-100.

## II.  Legal Standards

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Where the Rule 12(b)(1) motion raises a facial challenge—that is, one based solely on the allegations of the complaint (and any attached exhibits)—the plaintiff has no evidentiary burden in refuting that challenge. *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). On the other hand, where a defendant raises a factual challenge under Rule 12(b)(1), proffering evidence beyond the complaint, the plaintiff

generally "will need to come forward with evidence of their own to controvert that presented by the defendant." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016) (citation omitted). But "if the evidence proffered by the defendant is immaterial" to raising a factual dispute, a plaintiff is "entitled to rely on the allegations" asserted in the complaint. *Id.*; *see also Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (explaining that "[w]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits" (citation omitted)).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009) (citation omitted).

### III.  Discussion

**A.      Prospective Relief**

In moving under Rule 12(b)(1) to dismiss the claims for prospective relief against them, Barry and Kalish argue that the Fund has failed once again to plead facts sufficient to confer standing.  *See* Barry Motion at 10-11; Kalish Motion at 4-5.  The Court agrees.

Article III of the U.S. Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'"  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting U.S. Const. art. III, § 2).  "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing."  *Id.* (internal quotation marks omitted).  And in the class action context, at least "one named plaintiff [must] have standing with respect to each claim."  *Hyland v. Navient Corp.*, 48 F.4th 110, 118 (2d Cir. 2022).

To satisfy the "irreducible constitutional minimum of standing," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (internal quotation marks omitted), "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief," *TransUnion*, 594 U.S. at 423.  As the party invoking federal jurisdiction, the Fund "bears the burden of establishing these elements," and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  At the pleading stage (and in the context of a facial challenge to a plaintiff's standing), a court's task is to determine whether the allegations in the complaint

10

"affirmatively and plausibly suggest that [the plaintiff] has standing to sue." *Carter*, 822 F.3d at 56 (citation omitted).[4]

Moreover, where, as here, injunctive relief is sought, a plaintiff cannot meet the injury-in-fact requirement merely by relying on past injury. *Dorce v. City of New York*, 2 F.4th 82, 95 (2d Cir. 2021); *cf. O'Shea v. Littleton*, 414 U.S. 488, 495 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . ."). Rather, a plaintiff "must show a likelihood that he or she will be injured in the future." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998). "Such an allegation of future injury will be sufficient only if 'the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Dorce*, 2 F.4th at 95 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Allegations of possible future injury will not do. *Clapper v. Amnesty Int'l.*, 568 U.S. 398, 409 (2013).

Here, the Fund bears the burden of demonstrating a "substantial risk" that it will once again be subject to the allegedly unlawful forfeiture procedures of the Bronx Criminal Court Clerk's Office and of the DOF. This harm, as alleged, obtains only at the end of an attenuated chain of possible occurrences. As this Court previously articulated, in cases for which the Fund currently has outstanding bail obligations,

> the Court would need to assess the likelihood that (1) a defendant associated with that bail remains in criminal proceedings in the Bronx; (2) that defendant misses a court date and has a bench warrant issued for his arrest; (3) on the basis of that bench warrant alone (*i.e.*, without a judicial order of forfeiture), the Bronx County

---

[4] In moving to dismiss, Kalish attaches a copy of the Fund's website as of June 19, 2023, *see* Dkt. 85, Exh. B, in support of his contention that the Fund cannot demonstrate the likelihood of future harm, *see* Kalish Motion at 5. As discussed, *see supra* II, evidence outside of the pleadings may properly be considered where jurisdictional facts are disputed. But because the Court concludes from the face of the pleadings that the Fund has failed to sustain its burden to show standing, the Court need not consider that exhibit or any factual challenges to the Fund's theory of standing.

Criminal Court forfeits the defendant's bail without a court order; and (4) the DOF refuses to return such forfeited bail.

*Bronx Freedom Fund*, 2023 WL 2752098, at *6. This "inferential chain only lengthens for any future bails posted by the Fund," as the Court must then also assess the likelihood that the Fund will resume its practice of posting bails, *id.* at *6 n.5, which practice the Fund concedes it "scal[ed] back" in 2019, SAC ¶ 76.

In an effort to condense this inferential chain, the Fund appears largely to rely on its newly pleaded allegations that "someone released on bail will inevitably miss a court appearance," that "the Court will issue a bench warrant," that the Clerk's Office "will—not might—deem the bail forfeited without the Court issuing a forfeiture order and transmit the bail money to the [DOF]," and that the DOF "will then receive a CRC-131A form and refuse to return the bail." SAC ¶¶ 77, 78; *see* Opposition at 14 (arguing that these allegations "squarely resolve the deficiencies identified by this Court" in its March 31, 2023 Opinion and Order). But, contrary to the Fund's insistence, these bare allegations, without more, are insufficient to confer standing. *Cf. Baur v. Veneman*, 352 F.3d 625, 636-37 (2d Cir. 2023) ("While the standard for reviewing standing at the pleading stage is lenient, a plaintiff cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing."); *see also Fac., Alumni, & Students Opposed to Racial Preferences v. New York Univ. L. Rev.*, No. 18 Civ. 9184 (ER), 2020 WL 1529311, at *6 n.5 (S.D.N.Y. Mar. 31, 2020) ("[The plaintiff] cannot rely solely on conclusory allegations of injury . . . , even at the pleading stage."), *aff'd sub nom. Fac. v. New York Univ.*, 11 F.4th 68 (2d Cir. 2021).

To be sure, the Fund has provided some factual support for the assertion that, in 2020, the Bronx Criminal Court Clerk's Office deemed a bail forfeited without a court's forfeiture order upon issuance of a bench warrant. The Fund claims that the Clerk's "Office has openly admitted"

in writing that such procedures constitute its regular practice, alluding to emails it received in September 2020 and August 2021.  SAC ¶¶ 43-45.  Although neither email is attached to the Complaint, the Fund claims that the Clerk's Office asserted in a September 3, 2020 email to the Fund that "[w]hen a defendant warrants at any point between arraignment and sentencing, the bail is forfeited, regardless of when or how the case is disposed of."  *Id*. ¶ 44.  And in an August 16, 2021 email to the Fund, Kalish purportedly wrote, "In those instances when cash bail or a bail bond is forfeited, a forfeiture form is completed, signed and submitted by the court clerk to the appropriate authority, ie cash bail forfeiture forms to the NYC Dept of Finance & bail bond forfeiture forms to the (Bronx) District attorney's Ofc – Civil Collection unit) (form CRC 131A for cash bails forfeitures & CRC 131 for bail bond forfeitures)."  *Id.* ¶ 45.  While the Court could conceivably infer from the September 2020 email that the Clerk's Office *at that time* forfeited bail based on the mere issuance of a warrant, it is unable to draw such an inference from Kalish's August 2021 email, which provides no information on the circumstances under which the Clerk's Office deems bail forfeited in the first place.  Furthermore, neither email reflects the Clerk's Office's practices at the time of the filing of the Second Amended Complaint in April 2023, or what its practices would be going forward if the Fund in fact resumes posting bail.  And the Second Amended Complaint, which was filed over 2.5 years after the alleged September 2020 email, is completely devoid of any allegations of these practices occurring since then.  Without non-stale allegations establishing that the challenged practices are in effect and are likely to remain in effect in the future, the Court cannot assess the likelihood that the Clerk's Office will continue to deem bails forfeited without a court order.

In addition, even had the Fund sufficiently alleged that the challenged practices constitute the Clerk's Office's contemporaneous policy, it has still failed to show the requisite "personal

stake" in the continuation of these practices into the future. *TransUnion*, 594 U.S. at 423. Indeed, the Second Circuit has made clear that "the existence of an official policy, on its own, is [not] sufficient to confer standing to sue [for injunctive and declaratory relief] on any individual who had previously been subjected to that policy." *Dorce*, 2 F.4th at 95 (quoting *Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004)). The Fund's interest in the Office's forfeiture procedures arises only out of its five current outstanding bail obligations for proceedings in the Bronx and any future outstanding bail obligations for such proceedings. In either respect, the likelihood of the Fund being subjected to the challenged forfeiture procedures in connection with any such bail obligation turns on the likelihood of its clients missing future court appearances. But the Fund has not alleged any facts suggesting a "substantial risk" that its clients will miss their court appearances, or that such a delinquency is "certainly impending." *Id.*

In fact, the Fund's own allegation that approximately 92% of its clients *make* their court appearances, indicates the exact opposite, further contravening any inference that the Fund faces a substantial risk of the injury it alleges. *See* SAC ¶ 15; *see also id.* ¶ 77 ("[T]he large majority of those released on bail or bond appear for their court appearances."). And the Fund's assertion that "someone released on bail will inevitably miss a court appearance," *id.* ¶ 77—a mere truism— adds nothing to the relevant calculus of probabilities. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983) (recognizing the possibility that "among the countless encounters between the police and the citizens of a great city such as Los Angeles, there will be certain instances in which strangleholds will be illegally applied," but concluding that the plaintiff lacked standing to seek an injunction against such an illegal practice in part because it was "no more than speculation to assert" that the plaintiff "himself [would] again be involved in one of those unfortunate instances"). Indeed, not only has the Fund failed to allege that it has in fact resumed posting bail (only that it

"intends" to do so, SAC ¶ 76), but it has not alleged the volume of clients for whom it "intends" to post bail.

Nor can the Fund demonstrate a substantial risk that it will once again be subject to the challenged forfeiture procedures merely by relying on the four alleged instances in which the bails it posted between May 2018 and December 2019 were deemed forfeited between July 2018 and January 2020. *See id.* ¶¶ 54-74. Past injury alone cannot supply the sole predicate for a risk of future injury that is sufficiently concrete and imminent to confer Article III standing. *See Dorce*, 2 F.4th at 96 ("Past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy with respect to potential future similar wrongs." (internal quotation marks and brackets omitted)). Significantly, over three years have elapsed between January 2020, the date of the most recently alleged forfeiture determination, and the filing of the Second Amended Complaint in April 2023. Yet, the Fund has alleged no further instances of it being subject to the challenged forfeiture procedures, despite being granted the express opportunity by this Court to do so. *Cf. Lyons*, 461 U.S. at 108 (in concluding that the plaintiff had failed to demonstrate standing to seek injunctive relief against the challenged police practice, noting that "there was no allegation of further unfortunate encounters between [the plaintiff] and the police" despite five months having elapsed between the filing of the complaint and the plaintiff's first alleged encounter with the police). And just as the policies of the Clerk's Office in 2023 (when the Second Amended Complaint was filed) cannot be inferred from an email sent in September 2020, the likelihood that the Fund will itself be subject to these policies likewise cannot be inferred from forfeiture determinations made by the Clerk's Office over four years ago. Without more, such outdated allegations are insufficient to confer standing on the Fund for the prospective relief it seeks.

In sum, despite the Court's clear instruction in the March 31, 2023 Opinion and Order that the Fund must plead "a likelihood of future injury" to establish standing for prospective relief, *Bronx Freedom Fund*, 2023 WL 2752098, at *6, the Fund has come forward with no allegations in the Second Amended Complaint to allow the Court to find a likelihood that the Fund will suffer in the future the injury it alleges. At the most, the Fund has alleged the *possibility* of being subject to the purportedly unlawful forfeiture procedures at some point in the future, which itself requires the assumptions that the practices allegedly in place at the Clerk's Office over three years ago remain in effect today and will remain in place in the future, that the Fund will resume posting bail for clients with proceedings in the Bronx, and that some of those clients will fail to appear in court as required. These allegations fall far short of plausibly showing that the threatened harm is "certainly impending" or that the Fund faces a "substantial risk" of such harm. *See McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 300 (2d Cir. 2021) ("[T]he Supreme Court has made clear that 'allegations of possible future injury' or even an 'objectively reasonable likelihood' of future injury are insufficient to confer standing." (quoting *Clapper*, 568 U.S. at 409-10)).

As the Fund seeks only prospective relief against Barry, Kalish, and the John and Jane Doe Defendants, *see* SAC ¶¶ 3 at 4, 4 at 4, 6 at 5; Opposition at 1, the Court dismisses without prejudice the Second Amended Complaint for lack of subject matter jurisdiction as to those Defendants.

**B.   Section 1983 Claim**

The Court turns next to the Fund's claim against the City for compensatory damages arising from the purportedly unlawful forfeitures of the cash bails posted by the Fund. The City argues, *inter alia*, that the Fund fails to state a claim of municipal liability against it. City Motion at 17-22. Once again, the Court agrees.

16

In *Monell v. Department of Social Services of the City of New York*, the Supreme Court recognized that a municipality can be held liable under Section 1983 only when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by" that body's officers.  436 U.S. 658, 689 (1978).  "To hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (alteration in original and citation omitted).  As to the first prong of this inquiry, to establish the existence of a municipal policy or custom, a plaintiff must demonstrate that his or her constitutional injuries arose from:

> (1) the existence of a formal policy officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to deliberate indifference to the rights of those who come in contact with the municipal employees.

*Schroeder v. Cnty. of Nassau*, 158 F. Supp. 3d 123, 130 (E.D.N.Y. 2016) (citation omitted).  The requirement of an official policy or custom derives from the principle that "a municipality may not be held liable under [Section] 1983 solely because it employs a tortfeasor."  *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right.").  In other words, a municipality may not be liable under Section 1983 "by application of the doctrine of *respondeat superior*."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986).  Rather, a plaintiff must "demonstrate that, through its deliberate conduct, the

municipality was the 'moving force' behind the injury alleged.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404 (citation omitted).

The Fund contends that the DOF's bail forfeiture "practice as alleged in the [Second Amended Complaint] is one that is consistent and widespread such that a supervising policymaker must have been aware."  Opposition at 19.  In support of this theory, the Fund has described four occasions—as earlier mentioned—in which the DOF received bail money and CRC 131A forms from the Clerk's Office.  *See* SAC ¶¶ 54-74.  These four isolated instances—arising in connection with bail forfeiture determinations occurring more than four years ago over the course of a roughly one-and-a-half-year period—are insufficient to support the inference of a practice "so persistent and widespread . . . as to constitute a custom or usage with the force of law."  *Sorlucco v. N.Y.C. Police Dep't.*, 971 F.2d 864, 870-71 (2d Cir. 1992).  While "[t]here is no 'magic number' of instances of unconstitutional conduct that will suffice to permit the inference of a broader municipal policy or custom," "courts in this Circuit have rejected the notion that two, three, or even four incidents will support such an inference."  *Calicchio v. Sachem Cent. Sch. Dist.*, 185 F. Supp. 3d 303, 316 (E.D.N.Y. 2016) (citation omitted) (collecting cases); *see Giaccio v. City of New York*, 308 F. App'x 470, 471-72 (2d Cir. 2009) (affirming dismissal of *Monell* claim where the plaintiff identified "at most, only four examples" of the challenged practice because such "evidence [fell] far short of establishing a practice that it so persistent or widespread as to justify the imposition of municipal liability" (internal quotation marks omitted)).

Furthermore, the Fund has alleged no facts plausibly suggesting that the City was the "moving force" behind the Fund's alleged injury (*i.e.*, the improper forfeiture in those four

instances of the bail it has posted). *Brown*, 520 U.S. at 404. On the Fund's own telling, the DOF merely receives a CRC 131A form and bail money from the Bronx Criminal Court Clerk's Office, SAC ¶ 48, and subsequently "issues a notice informing the suretor/depositor that the money is deemed forfeited *as a result of the clerk's determination*," *id.* ¶ 50 (emphasis added). The Fund criticizes the DOF for accepting the bail "when it has reason to believe that no judge ordered a forfeiture," *id.* ¶ 48, but the Fund has provided no factual support for that bald assertion, on which the Fund's culpability is presumably alleged to hinge. As the Fund itself alleges, the public-facing policy of the Bronx Criminal Court Clerk's Office requires the Clerk to complete the CRC 131A form only when "the defendant fails to comply with his/her bail conditions *and the Court orders forfeiture*," *id.* ¶ 38 (emphasis in Second Amended Complaint), and "the Bronx Criminal Court clerks have been properly filing CRC131A forms," *id.* ¶ 39. Based on the Fund's own allegations, the DOF employees receiving these forms would not have known whether the Clerk had deemed the bail forfeited without the requisite court order. As the Court has previously explained, "a review of the CRC 131A forms submitted to the Court . . . does not reveal any field of information from which the DOF might be able to determine the procedure that led to the forfeiture for any specific bail, or otherwise indicate that the DOF has any knowledge of how a particular bail is forfeited and whether it was pursuant to a specific court order." *Bronx Freedom Fund*, 2023 WL 2752098, at *10; *see also* SAC, Exh. B (CRC 131A form). And given the Clerk's Office's stated policy, the DOF, in fact, would have had every reason to believe that the CRC 131A forms it received were completed only after a court ordered such forfeiture.[5]

---

[5] To the extent the Fund is arguing that the commencement of the instant action has put the DOF on notice of the Clerk's Office's allegedly improper forfeiture practices with respect to the completion of CRC 131A forms, *see* SAC ¶ 51; Opposition at 20-21, any events post-dating the alleged conduct—*i.e.*, the four instances of allegedly improper forfeiture for which the Fund seeks

The Fund's allegations therefore do not plausibly show "that through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404. As a result, the Fund has failed to allege a policy or custom that can subject the City to *Monell* liability, and the Court thus dismisses with prejudice the Fund's Section 1983 claim against the City.

## C.   The Declaratory Judgment Act Claim

Having dismissed the Fund's claim under Section 1983 as to all Defendants, the Court turns to the Fund's claim under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. SAC ¶¶ 94-95. The Declaratory Judgment Act does not provide an independent basis for federal jurisdiction, and, as discussed at *infra* III.D, the Court declines to exercise supplemental jurisdiction over the Fund's remaining state law claim. *See Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 752 (2d Cir. 1996) ("Section 2201 provides no independent basis for subject matter jurisdiction."). Accordingly, the Court dismisses the Fund's claim under the Declaratory Judgment Act. *See, e.g.*, *Eisenbach v. Vill. of Nelsonville*, No. 20 Civ. 8566 (VB), 2021 WL 5054119, at *7 (S.D.N.Y. Nov. 1, 2021).

## D.   State Law Claims

With all of the Fund's federal claims dismissed, the Court turns to the Fund's claim asserted under the New York State Constitution, SAC ¶¶ 90-93, which this Court may hear only through its exercise of supplemental jurisdiction, *see id.* ¶¶ 4-6 at 2-3.

A district court "may decline to exercise supplemental jurisdiction over [a pendent state law claim] if . . . the district court has dismissed all claims over which it has original jurisdiction."

---

compensatory damages from the City—have no bearing on the City's "degree of culpability" at the relevant time of those acts.

28 U.S.C. § 1367(c).  The statute does not create a "mandatory rule to be applied inflexibly in all cases."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).  Nevertheless, the Second Circuit has held that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Kelsey v. City of New York*, 306 F. App'x 700, 703 (2d Cir. 2009) (quoting *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003)); *see also Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 123-24 (2d Cir. 2006) (reversing a district court decision to retain supplemental jurisdiction over state law claims after dismissal of the federal claim, citing "the absence of a clearly articulated federal interest"); *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 147 (E.D.N.Y. 2015) ("In the interest of comity, the Second Circuit instructs that absent exceptional circumstances, where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should abstain from exercising pendent jurisdiction." (internal quotation marks omitted)).

Here, the case is still in the early stages of litigation, discovery has not yet commenced, and comity dictates that the Fund's New York State Constitution claim is better suited for resolution in state court.  *See Cedar Swamp Holdings, Inc. v. Zaman*, 487 F. Supp. 2d 444, 453 n.63 (S.D.N.Y. 2007) ("[A]t early stages in the proceedings, . . . little is to be gained by way of judicial economy from retaining jurisdiction.").  The Fund has provided no reason why the Court should deviate from the usual practice of declining jurisdiction over a related state law claim.  Indeed, the Fund does not even request that this Court exercise supplemental jurisdiction over its New York State Constitution claim in the event its federal claims are dismissed.  *See generally* Opposition.  Finding that the balance of the relevant factors points toward declining to exercise

supplemental jurisdiction here, the Court dismisses the Fund's remaining state law claim without prejudice to the Fund's refiling it in state court.

### E.   Leave to Amend

Lastly, the Court considers whether to grant leave to amend.  Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Fund has not asked the Court for leave to amend their Complaint.  "But even when a party does not ask for leave to amend, the Court may grant leave to amend *sua sponte*."  *In re Garrett Motion Inc. Sec. Litig.*, No. 20 Civ. 7992 (JPC), 2022 WL 976269, at *18 (S.D.N.Y. Mar. 31, 2022) (citation and internal quotation marks omitted) (collecting cases).  When deciding whether to *sua sponte* grant leave to amend, "courts will consider many factors, including undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility."  *Morales v. Kimberly-Clark Corp.*, No. 18 Civ. 7401 (NSR), 2020 WL 2766050, at *9 (S.D.N.Y. May 27, 2020) (citation omitted).

Having considered these factors, the Court declines to grant the Fund leave to file a third amended complaint.  As discussed, the Fund has now had two opportunities to amend its pleading based on the very grounds on which the Court bases its dismissal here.  Considering these circumstances and given the nature of the substantive deficiencies identified in the instant writing, the Court finds that granting the Fund yet another bite at the apple would be futile.  *Binn v. Bernstein*, No. 19 Civ. 6122 (GHW) (SLC), 2020 WL 4550312, at *34 (S.D.N.Y. July 13, 2020) ("To grant Plaintiffs leave to amend would be allowing them a third bite at the apple, which courts in this district routinely deny." (internal quotation marks omitted)), *report and recommendation adopted by* 2020 WL 4547167 (S.D.N.Y. Aug. 6, 2020).

## IV.  Conclusion

For the foregoing reasons, the Court dismisses the Second Amended Complaint in its entirety.  Count One is dismissed without prejudice as to Kalish, Barry, and the John and Jane Doe Defendants for want of jurisdiction and with prejudice as to the City.  Count Two is dismissed without prejudice to refiling in state court.  Count Three is dismissed without prejudice for want of jurisdiction.

The Clerk of Court is respectfully directed to close the motions pending at Docket Numbers 83, 86, and 88, and to close the case.

SO ORDERED.

_____
JOHN P. CRONAN
United States District Judge

Dated: March 28, 2024
     New York, New York